Slip Op. 14-156

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **JTEKT CORPORATION and KOYO CORPORATION OF U.S.A.**, <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES**, <br><br> Defendant, <br><br> and <br><br> **THE TIMKEN COMPANY**, <br><br> Defendant-intervenor. | **Before: Timothy C. Stanceu, Chief Judge** <br><br> **Consol. Court No. 07-00377** |

## <u>OPINION</u>

[Affirming a remand redetermination issued by the International Trade Administration, U.S. Department of Commerce, in litigation arising from administrative reviews of antidumping duty orders on ball bearings and parts thereof]

Dated: December 24, 2014

*Neil R. Ellis* and *Dave M. Wharwood*, Sidley Austin, LLP, of Washington, D.C., for plaintiffs JTEKT Corp and Koyo Corp of U.S.A.

*Diane A. MacDonald*, Baker & McKenzie, LLP, of Chicago, IL, for plaintiffs NTN Bower Corporation, NTN Corp., NTN Bearing Corp. of America, NTN-BCA Corp., NTN Driveshaft, Inc., and American NTN Bearing Manufacturing Corp.  With her on the brief were *Kevin M. O'Brien* and *Christine M. Streatfeild*.

*David A. Riggle*, W.L. Gore & Associates, of Newark, DE, for plaintiff Asahi Seiko Co., Ltd.

*Kevin M. O'Brien*, Baker & McKenzie, LLP, of Washington, D.C., for plaintiffs Nippon Pillow Block Co. Ltd. and FYH Bearing Units USA, Inc.

*Alexander H. Schaefer*, Crowell & Moring, LLP, of Washington, D.C., for plaintiffs NSK Ltd., NSK Corp., and NSK Precision America.

*Alexander H. Schaefer* and *Daniel Cannistra,* Crowell & Moring, LLP, of Washington, D.C., for plaintiffs Aisin Seiki Co., Ltd. and Aisin Holdings of America, Inc.

*Greyson L. Bryan*, O'Melveny & Myers, LLP, of Washington, D.C., for plaintiffs Nachi America, Inc., Nachi Fujikoshi Corp., and Nachi Technology, Inc.

*Claudia Burke*, Assistant Director, *L. Misha Preheim*, Senior Trial Counsel, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C., for defendant United States.  With them on the brief were *Jeanne E. Davidson*, Director, *Stuart F. Delery*, Assistant Attorney General.  Of counsel on the brief were *Shana Hofstetter*, Attorney, and *Daniel J. Calhoun*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce.

*Geert De Prest*, *Lane S. Hurewitz*, and *Terence P. Stewart*, Stewart and Stewart, of Washington, D.C., for plaintiff and defendant-intervenor the Timken Company.

Stanceu, Chief Judge: In this consolidated action,[1] several plaintiffs contested various

aspects of a determination ("Final Results") issued by the International Trade Administration,

U.S. Department of Commerce ("Commerce" or the "Department") to conclude the seventeenth

administrative reviews of antidumping duty orders on ball bearings and parts thereof from

France, Germany, Italy, Japan, Singapore, and the United Kingdom ("subject merchandise").

*See Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the*

*United Kingdom: Final Results of Antidumping Duty Admin. Reviews and Rescission of Review*

*in Part*, 72 Fed. Reg. 58,053 (Int'l Trade Admin. Oct. 12, 2007) ("*Final Results*").

Before the court is the second redetermination upon remand ("Second Remand

Redetermination") that Commerce submitted in response to the court's opinion and order in

*JTEKT Corp. v. United States*, 35 CIT __, 768 F. Supp. 2d 1333 (2011) ("*JTEKT I*").  *Final*

*Second Remand Determination* (Sept. 19, 2011), ECF No. 147 ("*Second Remand*

---

[1] Seven actions are consolidated under Consolidated Court Number 07-00377: NSK Ltd. v. United States (Ct. No. 07-00387); Aisin Seiki Co., Ltd. v. United States (Ct. No. 07-00392); NTN Bearing Corp. of America v. United States (Ct. No. 07-00395); Nippon Pillow Block Co. Ltd. v. United States (Ct. No. 07-00398); Asahi Seiko Co., Ltd. v. United States (Ct. No. 07-00409); Nachi Fujikoshi Corp. v. United States (Ct. No. 07-00412).  Order (July 29, 2008), ECF No. 26 (consolidating cases).

*Redetermination*").  For the reasons presented herein, the court affirms the Second Remand

Redetermination.

## I. BACKGROUND

When described together with their affiliates, there are seven plaintiffs in this

consolidated action, all of which contested various aspects of the Final Results involving the

antidumping duty order on ball bearings and parts from Japan (the "Order").  The seven plaintiffs

are: (1) Asahi Seiko Co., Ltd. ("Asahi"); (2) Aisin Seiki Co., Ltd. and Aisin Holdings of

America, Inc. (collectively, "Aisin"); (3) JTEKT Corp. and Koyo Corp. of U.S.A. (collectively,

"JTEKT"); (4) Nachi Technology, Inc., Nachi-Fujikoshi Corp., and Nachi America, Inc.

(collectively, "Nachi"); (5) FYH Bearing Units USA, Inc. and Nippon Pillow Block Co. Ltd.

(collectively, "NPB"); (6) American NTN Bearing Manufacturing Corp., NTN Bearing Corp. of

America, NTN Bower Corp., NTN Corp., NTN Driveshaft, Inc., and NTN-BCA Corp.

(collectively, "NTN"); and (7) NSK Corp., NSK Ltd., and NSK Precision America, Inc.

(collectively, "NSK").  *JTEKT I*, 35 CIT __, 768 F. Supp. 2d at 1338-39.  The seventeenth

administrative review of the Order covers entries of subject merchandise made during the period

of May 1, 2005 through April 30, 2006 ("POR" or "period of review").  *Final Results*, 72 Fed.

Reg. at 58,053.

The detailed background of plaintiffs' various challenges in this case is provided in the

court's prior opinions and is supplemented herein.  *See* Order 1-3 (Sept. 3, 2009), ECF No. 100

(first remand order); *JTEKT I*, 35 CIT __, 768 F. Supp. 2d at 1339-41 (second remand order);

*JTEKT Corp. v. United States*, 35 CIT __, Slip Op. 11-86 (July 20, 2011) (denying

reconsideration) ("*JTEKT II*"); *JTEKT Corp. v. United States*, 36 CIT __, Slip Op. 12-73

(June 4, 2012) (stay order) ("*JTEKT III*").

On October 12, 2007, Commerce issued the Final Results and an accompanying decision

memorandum ("Decision Memorandum").  *Final Results,* 72 Fed. Reg. at 58,054–55; *Issues &*

*Decision Mem. for the Antidumping Duty Admin. Reviews of Ball Bearings & Parts Thereof from*

*France, Germany, Italy, Japan, Singapore, & the United Kingdom for the Period of Review*

*May 1, 2005, through April 30, 2006* (Oct. 12, 2007), *available at*

http://enforcement.trade.gov/frn/summary/MULTIPLE/E7-20151-1.pdf ("*Decision Mem.*") (last

visited Dec. 18, 2014).  The Final Results assigned the following antidumping duty margins to

plaintiffs: Aisin, 6.15%; Asahi, 1.28%; JTEKT, 15.01%; Nachi, 11.46%; NPB, 26.89%; NSK,

3.66%; and NTN, 7.76%.  *Final Results*, 72 Fed. Reg. at 58,054.

A.  The First Redetermination in Response to a Remand Order on a Claim by Aisin

On September 3, 2009, upon defendant's consent motion for a voluntary remand to

address a claim by Aisin, the court issued a narrow first remand order requiring Commerce to

reconsider the methodology it used in the Final Results to calculate constructed export price

("CEP") for sales of Aisin's merchandise.  Order 1-3, ECF No. 100 ("first remand order").

Commerce filed the results of this remand order ("First Remand Redetermination") on

December 16, 2009, in which it changed its methodology for determining CEP and revised

Aisin's margin from 6.15% to 1.13%.  *Redetermination Pursuant to Remand* 1, ECF No. 105.  In

*JTEKT I*, issued on May 5, 2011, the court affirmed the Department's resolution of Aisin's claim

concerning CEP, to which no party had objected.  *JTEKT I*, 35 CIT at __, 768 F. Supp. 2d

at 1363-64.

B.  The Court's Second Remand Order

The court's opinion and order in *JTEKT I* also addressed various challenges not

adjudicated in the limited first remand order, as discussed below.

1.  The Order to Reconsider the Use of the "Zeroing" Methodology

The court's opinion and order in *JTEKT I* included, *inter alia*, a second remand order on

the Department's decision in the Final Results to apply the "zeroing" methodology, under which

Commerce assigned to U.S. sales made above normal value a dumping margin of zero, instead of

a negative margin, when calculating weighted-average dumping margins.  *Id.* at __, 768 F.

Supp. 2d at 1364.  The court considered a remand on the zeroing question necessary because of

an intervening decision of the Court of Appeals for the Federal Circuit ("Court of Appeals"),

*Dongbu Steel Co. v. United States*, 635 F.3d 1363 (Fed. Cir. 2011).  *Id.* at __, 768 F. Supp. 2d

at 1342-43.  The court ordered Commerce to modify its decision to apply the zeroing

methodology or, alternatively, to provide an explanation of the Department's inconsistent

interpretation of 19 U.S.C. § 1677(35) with respect to antidumping duty investigations and

administrative reviews.[2]  *Id.* at __, 768 F. Supp. 2d at 1343.  The court subsequently denied a

motion by defendant for reconsideration of the court's directive in *JTEKT I* concerning zeroing.

*JTEKT II*, 35 CIT at __, Slip Op. 11-86 at 4.

2.  Rejection of Claims Challenging the Use of a Revised Model-Match Methodology

Commerce uses a "model-match" methodology to identify identical and similar

merchandise for the purpose of conducting comparisons between the U.S. price of subject

merchandise and the price of comparable merchandise in the comparison market.  *See JTEKT I*,

35 CIT at __, 768 F. Supp. 2d at 1343-44 (citing 19 U.S.C. §§ 1677b, 1677(16)(A)-(C)).  In

*JTEKT I*, the court considered claims by JTEKT, Nachi, NBP, NSK, and NTN that challenged

the Department's use of a ball bearing model-match methodology in the seventeenth

_____

[2] Unless otherwise indicated, all statutory citations herein are to the 2006 edition of the
U.S. Code and all regulatory citations herein are to the 2007 edition of the Code of Federal
Regulations.

administrative reviews that differed from the methodology Commerce used in the first fourteen

administrative reviews of the ball bearing antidumping duty orders. *Id.* at __, 768 F. Supp. 2d

at 1345.  The court rejected these claims, finding lawful the Department's decision to adopt the

particular model-match methodology used in the seventeenth administrative reviews.[3]  *Id.* at __,

768 F. Supp. 2d at 1345-50.

### 3.  The Court's Consideration of Claims Challenging Individual Model Matches

The court in *JTEKT I* also considered claims of JTEKT, NPB, NSK, and Asahi that the

Department's model-match methodology produced certain individual matches that did not satisfy

the statutory criteria for similar merchandise as set forth in 19 U.S.C. § 1677(16).  *Id.* at __,

768 F. Supp. 2d at 1350.  The court rejected these claims other than one claim made by JTEKT,

as discussed below.

### a.  The Order Concerning an Individual Match Challenged by JTEKT

JTEKT identified fourteen ball bearing matches it claimed to be impermissible under the

statute.  *Id.*  In *JTEKT I*, the court denied relief on all but one of the fourteen claims.  *Id* at __,

768 F. Supp. 2d at 1351-53.  The court issued a remand with respect to one match (JTEKT's

"third match"), noting that Commerce had rejected as untimely certain information that raised a

factual issue as to whether that match resulted from a misapplication of the model-match

---

[3]  The court reasoned that the Court of Appeals for the Federal Circuit ("Court of Appeals") had previously rejected arguments similar to those that plaintiffs advanced in this case, noting that 19 U.S.C. § 1677(16) "'is silent with respect to the methodology that Commerce must use to match a U.S. product with a suitable home-market product.'"  *JTEKT Corp. v. United States*, 35 CIT __, __, 768 F. Supp. 2d 1333, 1346 (2011) ("*JTEKT I*") (citing *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008) (quoting *Koyo Seiko Co. v. United States,* 66 F.3d 1204, 1209 (Fed. Cir. 1995)).  After the court issued *JTEKT I*, the Court of Appeals sustained the Department's application of the revised model-match methodology in the eighteenth administrative reviews of the antidumping duty orders on ball bearings, stating that "Commerce has provided ample justification for the use of this method and it is therefore reasonable."  *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011).

methodology and ordering Commerce to reconsider that information.  *Id* at __, 768 F. Supp. 2d at 1352-53, 1364.

    b.  Rejection of Claims by NPB, NSK, and Asahi that Individual Matches Were Unlawful

NPB claimed that Commerce impermissibly matched housed bearings to unhoused bearings and bearings with collars to bearings without collars.  *JTEKT I*, 35 CIT at __, 768 F. Supp. 2d at 1353-55.  The court dismissed these claims in *JTEKT I* for failure to exhaust administrative remedies, noting that NPB had not raised the issue of these matches in the case brief it filed during the review.  *Id.*

In *JTEKT I*, the court also rejected a claim by NSK that the Department's application of the model-match methodology impermissibly produced egregiously dissimilar matches.  *Id.* at __, 768 F. Supp. 2d at 1355-56.  The court concluded that NSK had not substantiated its claim with specific record evidence that such objectionable matches of its merchandise actually occurred.  *Id.*  The court reasoned that "NSK's argument reduces to a contention that the new model-match methodology theoretically could result in matching models under the new methodology that would have been rejected under the old methodology," *id.* at __, 768 F. Supp. 2d at 1356, a contention the court found insufficient as a basis for overturning the Department's decisions, *id.*

Asahi claimed that the Department's matching of its "standard bearings" sold in the United States with its "high temperature bearings" sold in Japan was inconsistent with 19 U.S.C. § 1677(16)(B).  *Id.*  The court denied relief on this claim on the basis that the Department's model-match methodology has a mechanism for adjusting for differences in the variable cost of manufacturing and for rejecting matches in which that adjustment would be too large.  *Id.* at __, 768 F. Supp. 2d at 1356-57.  Noting that Asahi had proposed in its case brief to Commerce that

the model-match methodology should be modified to address specifically the differences between standard and high-temperature bearings, the court decided that Commerce did not exceed its discretion in rejecting Asahi's proposal because the proposal was made at a late stage of the review proceeding.  *Id* at __, 768 F. Supp. 2d at 1357.

  4.  The Order for Consideration of NPB's Proposed Changes to the Model-Match Methodology

        During the review, NPB proposed substantive changes to the model-match methodology suggesting that Commerce incorporate the existence of various physical characteristics of ball bearings that the methodology did not address specifically.  *Id.*  Commerce rejected this proposal for the same reason it rejected the proposal by Asahi: it considered the proposal to have been made in the case brief and, therefore, too late in the review to merit consideration.  *Id* at __, 768 F. Supp. 2d at 1357-58.  In *JTEKT I*, the court determined that the record contradicted the Department's finding that NBP had first made the proposal in a case brief.  *Id.* at __, 768 F. Supp. 2d at 1358.  The court noted record evidence showing that NPB made the proposal in a response to a supplemental questionnaire, six months prior to publication of the preliminary results of the review.  *Id.*  The court also observed that "Commerce never made a specific finding that it could not consider the merits of NPB's proposal for additional physical characteristics . . . due to the date on which the supplemental questionnaire response was filed." *Id.*  The court, therefore, ordered Commerce to reconsider the decision to reject NPB's proposal. *Id* at __, 768 F. Supp. 2d at 1358, 1364.

  5.  The Order on Bearings Claimed by NTN to Fall Within More than One Design Type

        As discussed later in this Opinion, the model-match methodology matches bearings according to various characteristics, including specified "design types" of ball bearings.  In considering various claims by NTN that the model-match methodology should consider

incorporating additional design types, the court concluded that Commerce had not addressed one

of the issues raised by NTN, specifically, how the model-match methodology resolved the

problem of bearings that could be classified within more than one of the specified design types.

*Id.* at __, 768 F. Supp. 2d at 1360.  The court directed Commerce to resolve this issue upon

remand.  *Id* at __, 768 F. Supp. 2d at 1360, 1364.

### 6.  Rejection of NSK's Claim Pertaining to Certain Employee Benefit Expenses

NSK claimed that Commerce, when calculating the constructed export price of its

merchandise, improperly deducted certain employee benefit expenses that NSK incurred in the

United States on behalf of employees who are Japanese nationals.  *Id.* at __, 768 F. Supp. 2d

at 1360-62.  Denying relief on this claim, the court affirmed the Department's findings that the

employees received the benefits and were supporting the U.S. sales to unaffiliated purchasers; it

also affirmed the Department's conclusion that the expenses qualified for deduction as

"'expenses associated with commercial activities in the United States that relate to the sale to an

unaffiliated purchaser'" within the meaning of the Department's regulation.  *Id.* at __,

768 F. Supp. 2d at 1361 (citing 19 C.F.R. § 351.402(b)).

### C.  The Department's Second Remand Redetermination

Commerce filed the Second Remand Redetermination on September 19, 2011, *Second

Remand Redetermination* 1, and NPB, JTEKT, and NTN each filed comments thereon on

October 19, 2011, Pls.' Nippon Pillow Block Co. Ltd. & FYH Bearing Units USA, Inc.

Comments on Second Remand Determination, ECF No. 153 ("NPB's Comments"); Comments

of Pls. JTEKT Corp. & Koyo Corp. of U.S.A. on Second Remand Determination, ECF No. 154

("JTEKT's Comments"); Pls.' Comments on the Dep't of Commerce's Second Remand

Determination, ECF No. 155 ("NTN's Comments").  Timken filed rebuttal comments on

December 14, 2011, Timken's Rebuttal Comments in Support of Commerce's Remand

Determination, ECF No. 160 ("Timken's Comments"), and defendant filed a reply on

December 22, 2011, Def.'s Reply to Pls.' Comments upon the Second Remand Redetermination,

ECF No. 165 ("Def.'s Reply"). In the Second Remand Redetermination, Commerce did not

recalculate the margins for any respondent. *Second Remand Redetermination* 2.

<u>D.  The Court's Order Staying these Proceedings</u>

Before reviewing the Second Remand Redetermination, the court, upon a motion by

several plaintiffs, stayed this case until thirty days after the final resolution of all appellate

review proceedings in *Union Steel v. United States*, CAFC Court No. 2012-1248, which

addressed the question of whether it was permissible for Commerce to use its zeroing

methodology in administrative reviews of antidumping duty orders. *See JTEKT III*, 36 CIT

at __, Slip Op. 12-73 at 7. The Court of Appeals issued an opinion in *Union Steel v. United*

*States*, 713 F.3d 1101 (Fed. Cir. 2013) ("*Union Steel*"), on April 16, 2013 and a mandate on

June 10, 2013.

On August 15, 2013, several plaintiffs asked the court to stay further proceedings in this

case until the resolution of all appellate proceedings in *NSK Corp. v. U.S. Int'l Trade Comm'n*,

716 F.3d 1352 (Fed. Cir. 2013), a request the court later denied as moot. Order (June 5, 2014),

ECF No. 182.

## II.  DISCUSSION

The court exercises subject matter jurisdiction over this action pursuant to section 201 of

the Customs Courts Act of 1980, 28 U.S.C. § 1581(c). The court must "hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law."  *See* Tariff Act of 1930 ("Tariff Act") § 516A,

19 U.S.C. § 1516a(b)(1).

<u>A.  The Court Affirms the Department's Application of the Zeroing Methodology</u>

In an administrative review of an antidumping duty order, Commerce determines both the

normal value and the export price ("EP"), or, if the EP cannot be determined, constructed export

price ("CEP"), for the subject merchandise under review.  Tariff Act § 751, 19 U.S.C.

§ 1675(a)(2)(A)(i).  Commerce then determines an antidumping duty margin by calculating the

amount by which the normal value exceeds the EP or CEP.  *Id.* §§ 1675(a)(2)(A)(ii),

1677(35)(A).  When Commerce determines an antidumping duty margin according to the

zeroing methodology, as it did in the seventeenth administrative reviews, it assigns a value of

zero, rather than a negative margin, where the normal value is less than the EP or CEP.  *Union*

*Steel*, 713 F.3d at 1104.  Commerce then aggregates these margins to calculate a

weighted-average dumping margin.  19 U.S.C. § 1677(35)(B).

JTEKT, NPB, NTN, Aisin, and Nachi challenged the Department's use of zeroing in the

seventeenth administrative reviews.  *JTEKT I*, 35 CIT at __, 768 F. Supp. 2d at 1341-43.  As

discussed previously, *JTEKT I* instructed Commerce to either reconsider the use of zeroing in

calculating the weighted-average dumping margins or "provide an explanation for its express or

implied construing of 19 U.S.C. § 1677(35) inconsistently with respect to antidumping duty

investigations and administrative reviews."  *Id.* at __, 768 F. Supp. 2d at 1364.  On remand,

Commerce did not modify its decision to apply zeroing and did not recalculate the antidumping

margins for those plaintiffs challenging zeroing.  *Second Remand Redetermination* 2.  Commerce

provided an explanation for its continued application of zeroing in administrative reviews while

ceasing to apply zeroing in antidumping investigations.  *Id.* at 4-14.  In comments on the Second

Remand Redetermination, various parties found fault with the Department's explanation for the continued application of zeroing in administrative reviews. *See* JTEKT Comments 9-11; NTN Comments 3-7; NPB's Comments 5-6.

After the parties to this action submitted comments on the Second Remand Redetermination, the Court of Appeals issued its decision in *Union Steel*. In *Union Steel*, the Court of Appeals affirmed the Department's use of zeroing in circumstances that the court considers analogous to those presented by this case. *See Union Steel*, 713 F.3d at 1103. Upon considering the Department's explanation for its use of zeroing and the opinion of the Court of Appeals in *Union Steel*, the court concludes that *Union Steel* is dispositive of the zeroing claims at issue in this action and sustains the Department's use of zeroing in the Second Remand Redetermination.

B.  Remaining Claims Involving Application of the Model-Match Methodology

To determine an antidumping margin, Commerce compares the U.S. price of the subject merchandise with the price of comparable merchandise (the "foreign like product") in the "home" market (i.e., the actual home market or another comparison market). 19 U.S.C. § 1677b. In identifying a foreign like product, Commerce attempts to match U.S. sales of the subject merchandise with home market sales of identical merchandise. 19 U.S.C. § 1677(16)(A). Where Commerce is unable to identify home market sales of identical merchandise, Commerce attempts to match a U.S. sale of subject merchandise with a home market sale of similar merchandise. *See id.* § 1677(16)(B)-(C).

Commerce first applied its revised model-match methodology in the fifteenth

administrative reviews of the ball bearing antidumping duty orders.[4]  *JTEKT I*, 35 CIT at __,

768 F. Supp. 2d at 1344.  Under the revised methodology, Commerce matches a ball bearing

model sold in the United States, i.e., a "subject" ball bearing, with one sold in the home market

only if the two bearings are identical with respect to the following four physical characteristics:

(1) load direction, (2) number of rows of rolling elements, (3) precision rating, and (4) ball

bearing "design type."  *Id.*  As applied in the seventeenth reviews, the model-match methodology

recognized the following ball bearing design types: angular contact, self-aligning, deep groove,

integral shaft, thrust ball, housed, and insert.  *Id.*  For pairs of bearings that are identical with

respect to all four physical characteristics, Commerce examines four quantitative characteristics:

(1) load rating, (2) outer diameter, (3) inner diameter, and (4) width.  *Id.*  Commerce makes the

match only if the sum of the individual deviations for these four quantitative characteristics does

not exceed forty percent.  *Id.*  Commerce also applies a "difference-in-merchandise adjustment"

("DIFMER" adjustment), under which Commerce makes a price adjustment to account for any

difference in the variable cost of manufacturing, up to twenty percent.  *Id.*  Commerce does not

make the match if the DIFMER adjustment would exceed twenty percent.  *Id.*

   1.  The Court Affirms the Department's Rejection of NPB's Proposal to Incorporate Additional
                   Physical Characteristics Into the Model-Match Methodology

       As discussed previously, NBP proposed a modification to the model-match methodology

that Commerce rejected, erroneously, on the ground that NPB first made the proposal in a case

---

[4] In the first fourteen administrative reviews of the antidumping duty orders, the U.S.
Department of Commerce ("Commerce" or the "Department") identified similar merchandise
using what was termed the "family" model-match methodology, according to which Commerce
grouped ball bearings based on exact matches of eight specific characteristics.  *JTEKT I*,
35 CIT at __, 768 F. Supp. 2d at 1344.

brief.  *JTEKT I*, 35 CIT at __, 768 F. Supp. 2d at 1357.  NPB's proposal was that "at a

minimum" Commerce should incorporate into the methodology certain additional physical

characteristics, namely, types of seals (e.g., standard or heat-proof), types of grease (e.g.,

standard or heat-proof), ceramic versus non-ceramic, and diameters of a second inner dimension,

second outer dimension, second width dimension, and third width dimension.  *Id*.  Before the

court, NPB argued that the Department's decision not to incorporate the additional physical

characteristics resulted in the mismatch of standard bearings that NPB sold in the United States

to high temperature bearings and other specialized bearings that NPB sold in the home market of

Japan.  *Id.*

       On remand, Commerce acknowledged that it made a factual error as to the timing of

NPB's proposal but nevertheless maintained that it acted appropriately in declining to consider

that proposal during the review.  *Second Remand Redetermination* 30.  Commerce explained that

"the timing of NPB's proposal," *id.*, which was five months into the review, "still presents

difficulty," *id.*, and that "we did not have the time to give reasonable consideration to NPB's

proposal when it made the proposal in its response to our supplemental questionnaire," *id.* at 35.

Commerce noted that in the final results of the prior administrative review it had instructed

parties that proposals for modifications to the model-match methodology, including proposals to

incorporate additional physical characteristics, must be made at the beginning of the

administrative review period.  *Id.* at 30 (citing *Issues & Decision Mem. for the Antidumping Duty*

*Admin. Reviews of Ball Bearings & Parts Thereof from France, Germany, Italy, Japan, & the*

*United Kingdom for the Period of Review May 1, 2004, through April 30, 2005*, at 23-24

(July 14, 2006), *available at* http://enforcement.trade.gov/frn/summary/MULTIPLE/E6-11123-

1.pdf ("*Decision Mem. AR 16*") (last visited Dec. 18, 2014).  Commerce recounted in the Second

Remand Redetermination that NPB submitted its proposal in December 2006, more than five

months after Commerce initiated the administrative review in July 2006 and after Commerce

first issued questionnaires on July 10, 2006.  *Id.*  Commerce maintained that adopting NPB's

proposal would have affected the methodology applied to other respondents, requiring

Commerce to collect data concerning the additional characteristics from all respondents "by

incorporating them into our questionnaire." *Id.* at 31.  Because these data were never collected,

Commerce concluded that the record lacked the data from the other respondents that would be

needed for implementation of NPB's proposed physical characteristics.  *Id.* at 32.

On the reasoning Commerce has put forth, the court affirms the Department's decision

not to adopt NPB's proposal to incorporate additional physical characteristics into the

model-match methodology.  The court is guided by two considerations.  First, regarding

procedure, while the notice of a deadline provided in a prior review cannot suffice for purposes

of the current review, the court does not view the failure of Commerce to provide notice of the

deadline at the initiation of the seventeenth review as a sufficient reason to overturn the

Department's decision to reject NPB's proposal.  When viewed solely in the context of the

seventeenth review, that decision did not violate any procedural requirement in the statute or the

Department's regulations.[5]  Second, Commerce acted reasonably in light of the time constraints

---

[5] The Department's regulations, at 19 C.F.R. § 351.301(b)(2), require the submission of new factual information for the final results of an administrative review by "140 days after the last day of the anniversary month, except that factual information requested by the verifying officials from a person normally will be due no later than seven days after the date on which the verification of that person is completed . . . ."  Nevertheless, a proposal to modify the existing model-match methodology requires more than a submission of new factual information: a party must request a methodological change as well as submit any new factual information on which that party relies in support of its proposal.

under which it must conduct a review[6] and the obligations to ensure both consistency and

procedural fairness with respect to all parties to the review.  Here, the need for consistency

supported the Department's reasoning that it could not adopt changes to the physical

characteristics used in the methodology unless it were practicable to apply those changes to the

ball bearings of all respondents in the review.  The record lacked the data with which Commerce

could have accomplished this task because NPB made its proposal at a time that did not allow

Commerce to distribute to the various respondents initial questionnaires that would solicit the

necessary information to adopt NPB's proposal.  Additionally, the Department's obligation to

ensure procedural fairness required that all interested parties have the opportunity to consider

and comment on a proposal for a fundamental change to the methodology.

        The court is not persuaded by the objections to the Department's decision that NPB offers

in comments on the Second Remand Redetermination.  NPB argues that Commerce failed to

explain why it did not have sufficient time to consider the proposal, especially in light of the

various supplemental questionnaires that Commerce issued after NPB had already submitted the

proposal for additional physical characteristics.  NPB's Comments 4-5.  The court disagrees.

---

        [6] Section 751(a)(3)(A) of the Tariff Act of 1930, 19 U.S.C § 1675(a)(3)(A), provides that
Commerce shall make a preliminary determination in an administrative review:

        [W]ithin 245 days after the last day of the month in which occurs the anniversary
        of the date of publication of the order . . . , and a final determination . . . within
        120 days after the date on which the preliminary determination is published.  If it
        is not practicable to complete the review within the foregoing time, the
        administering authority may extend that 245-day period to 365 days and may
        extend that 120-day period to 180 days.  The administering authority may extend
        the time for making a final determination without extending the time for making a
        preliminary determination, if such final determination is made not later than 300
        days after the date on which the preliminary determination is published.

*Id.*; *see also* 19 C.F.R. § 351.213(h).

Commerce explained why changing the model-match methodology to expand the list of physical characteristics was not practicable unless it could act on a proposal to do so when formulating the initial questionnaires.  *Second Remand Redetermination* 30-32.  Specifically, Commerce stated that a "necessary part" of any decision to adopt NPB's proposed physical characteristics "would be to ask for comments from all parties to ensure that each of these additional characteristics are appropriate for examination and that the appropriate values be reported for a particular characteristic . . . ."  *Id.* at 31.  Commerce claimed that it "would need the time, beginning from close to the initiation of the review, to solicit and analyze comments from interested parties and to formulate changes to the model-match methodology, if appropriate."  *Id.*  Moreover, Commerce stated that it would want to consider comments from other interested parties on how to integrate the proposed physical characteristics into the model-match methodology.  *Id.* at 37-38.  It explained that although it distributed supplemental questionnaires, these later questionnaires "sought clarification and information to correct deficiencies with respect to parties' responses to questions we had asked previously," *id.* at 35, and not "information relating to entirely new physical characteristics which we had never required respondents to report previously," *id.*  According to Commerce, requesting information on the additional physical characteristics five months into the administrative proceeding, which likely would require Commerce to issue later supplemental questionnaires to collect any deficient information, would have delayed the administrative review contrary to the deadlines imposed in section 751(a)(3)(A) of the Tariff Act, 19 U.S.C. § 1675(a)(3)(A).  *Id.* at 35-36.  Commerce noted that it found the need to exercise its authority to extend the deadline for the preliminary results even though it did not request supplementary information from respondents on the additional physical characteristics that are the subject of NPB's proposal.  *Id.* at 35.

NPB makes the related argument that Commerce did not actually need to request supplemental information from the other respondents, asserting that Commerce could have extracted the additional physical characteristics (e.g., greases, added dimensions, etc.) from the abbreviated product codes already provided by the respondents in response to questionnaires. *Second Remand Redetermination* 36.  The court rejects this argument based on an explanation Commerce offered in the Second Remand Redetermination, which the court finds reasonable. Commerce explained that it requests that respondents assign a control number to each unique product so that Commerce can match *identical* merchandise based on the assigned control numbers.  *Id.* at 37.  Commerce acknowledged that "the control numbers should reflect differences in physical characteristics such as seals and shields," *id.*, but also noted that "we have never asked respondents to report such characteristics as separate variables," *id.*  Commerce explained that using the product codes to identify *similar* merchandise would require Commerce to cross-reference information from the product codes to respondents' product catalogues in a process that would be "time-consuming and potentially fraught with error."  *Id.*; *see also* Timken's Comments 29.  Based on these considerations, Commerce concluded that in order for it to consider the additional physical characteristics in identifying *similar* merchandise, respondents would have to report information concerning these characteristics instead of the Department's deriving these characteristics from control numbers.  *Second Remand Redetermination* 37.  In view of the detailed explanation in the Second Remand Redetermination, which the court considers reasonable, the court has no grounds to dismiss the Department's concerns.

NPB argues, further, that "there was no need" for it to submit its proposal at the beginning of the seventeenth administrative reviews because, according to NPB, Commerce

already had agreed to pursue NPB's proposal in the final results of the sixteenth administrative

reviews.  NPB's Comments 3.  NPB argues that because Commerce issued the final results in the

sixteenth reviews after Commerce already had initiated the seventeenth reviews, NPB would

have expected that Commerce first sought information on the additional physical design types in

supplemental questionnaires.  *Id.*  According to NPB, "it became apparent that Commerce had

retracted from its agreement to consider NPB's proposal," *id.*, only after Commerce issued

supplemental questionnaires in the seventeenth reviews, *id.*

     Although NPB provides no specific citation of an "agreement" that emerged from the

final results of the sixteenth administrative reviews, the court can infer that NPB is describing a

passage from the issues and decision memorandum for those reviews (of which the court takes

judicial notice).  In that passage, Commerce rejected NPB's proposal for additional physical

characteristics and explained that NPB's request, made in a case brief after Commerce had

issued the preliminary results of that review, had come too late and lacked details as to proposed

implementation of the proposal.  *See Decision Mem. AR 16* at 23-24.  Commerce explained that

"[w]e intend to pursue this matter further in subsequent reviews," *Id.* at 24, but the court does not

discern in this statement an actual "agreement" to consider NPB's proposal in the next review

absent some action by NPB to submit a proposal at the beginning of the review.  As defendant

points out, the discussion by Commerce in the sixteenth reviews "did not absolve NPB of its

responsibility to raise the issue in a timely manner in the subsequent reviews."  Def.'s Reply 30.

In the seventeenth reviews, Commerce could not have known whether NPB would submit such a

proposal until NPB actually did so, in December 2006.

     Finally, the court rejects NPB's argument that the Department's decision not to

incorporate the additional physical characteristics resulted in the mismatch of standard bearings

that NPB sold in the United States to high temperature bearings and other specialized bearings

that NPB sold in the home market of Japan.  The Department's statutory obligation is to ensure

that any methodology it applies is consistent with 19 U.S.C. § 1677(16).  As the Court of

Appeals recognized, "Congress has granted Commerce considerable discretion to fashion the

methodology used to determine what constitutes 'foreign like product' under the statute."  *SKF*

*USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008) (citation omitted).  In this case,

NPB fails to substantiate its claim that the Department's decision not to incorporate the

additional characteristics impermissibly mismatched standard bearings that NPB sold in the

United States with high temperature bearings and other specialized bearings that NPB sold in

Japan.  NPB has not demonstrated that the methodology Commerce applied, and specifically the

DIFMER adjustment and a DIFMER-based limitation on matches, were inadequate to address

the differences between standard and specialized bearings so as to render the matches

impermissible under the statutory standard.

> 2.  The Court Affirms the Department's Decision to Reject NTN's Proposal to Add Design
> Types to the Model-Match Methodology

In contesting the Final Results, NTN claimed that the seven bearing design types

Commerce used in its methodology (angular contact, self-aligning, deep groove, integral shaft,

thrust ball, housed, and insert) were insufficient to allow for variations in NTN's bearings.

*JTEKT I*, 35 CIT at __, 768 F. Supp. 2d at 1359.  NTN proposed that Commerce add a number of

ball bearing design types "'that [NTN] used in the normal course of its business'" and reported to

Commerce during the reviews.  *Id.* (citation omitted).  Commerce denied this request, explaining

that some of the requested design types are "'distinguishable due to a single element of

difference or an element of difference that is not pertinent,'" *id.* (citation omitted), and that some

of the separate design designations concern product characteristics, such as load direction and

rating, "for which Commerce already accounts in the new model-matching methodology," *id.*

Reviewing the Department's decision not to incorporate the additional design types

proposed by NTN, the court concluded in *JTEKT I* that in the Final Results Commerce "did not

explain how it categorized bearings that could be classified according to more than one design

type." *Id.* at __, 768 F. Supp. 2d at 1360 (stating that because "Commerce has failed to address

NTN's argument by explaining its treatment of bearings that can fit within two design types, the

court will direct Commerce to resolve this issue upon remand.") *Id.*  The Court required

Commerce, on remand, to "reconsider NTN's proposal to incorporate into the model-match

methodology additional design-type categories and explain its rejection of that proposal with

respect to individual bearings described in more than one design type." *Id.* at __, 768 F.

Supp. 2d at 1364.

On remand, Commerce answered the court's question regarding bearings classified

within more than one design type by concluding that NTN was correct in identifying two design

types applied by the model-match methodology—"thrust" ball and "angular contact" ball

bearings—for which there was "overlap." *Second Remand Redetermination* 42.  The

Department's response indicates to the court, first, that an overlap between two design types is

possible under the methodology and, second, that Commerce did not have in place during the

review a procedure for resolving the question of how a respondent is to report bearings falling

within more than one design type.  The Second Remand Redetermination also concludes that the

two design types NTN identified as overlapping did not result in mismatches during the review.

*Id.*  Commerce explained that a match of two ball bearings would occur only if the bearings

share the same four physical characteristics, including design type and load direction, and that

the record data of the review showed that differences in load direction prevented any mismatches stemming from the two design types that NTN identified.  *Id.*

In its comments on the Second Remand Redetermination, NTN does not dispute the Department's finding that no actual mismatches resulted during the review due to the differences in load direction that Commerce described.  NTN argues, nevertheless, the design types selected by Commerce are unsustainable because Commerce failed to instruct respondents on what to do when reporting a ball bearing that falls under more than one design type.  NTN's Comments 8. According to NTN, the "single example of thrust and angular contact bearings demonstrates the importance of the Court's directive to examine all of NTN's reported design types . . . ."  *Id.* at 8.

The court disagrees with NTN's argument that the design types Commerce used in the model-match methodology during the review are unsustainable.  The overlap between two design types identifies a flaw in the model-match methodology, as design types are intended to describe different classes of ball bearings.  Unless these design types are intended to be, and are, mutually exclusive, some difficulties in reporting by respondents and difficulties in administration of the model-match methodology would appear to be inevitable.  Nonetheless, on the record of this review, the court must conclude that the flaw NTN has identified is of a conceptual nature.  As previously noted, NTN's comments do not object to the Department's finding that the overlap did not result in mismatches during the seventeenth review.  Overlaps between design types might pose problems in future reviews, but the court's concern necessarily is limited to the administrative review under consideration, and NTN has not shown during the second remand proceeding that the conceptual flaw rendered the design types unreasonable as applied during the review or adversely affected NTN's margin calculation.  *See JTEKT Corp. v. United States*, 642 F.3d 1378, 1382 (Fed. Cir. 2011) ("in order to overturn Commerce's

determination of design types, the appellant must show that 'Commerce's choice of design types . . . was unreasonable.'") (citation omitted).  In light of the standard of review the court is to apply in adjudicating NTN's claim centering on design types, the court must conclude that NTN has not met the burden of showing that Commerce made an error of fact or law that justifies another remand.  Because no actual mismatches resulted from the flaw, the court can identify no purpose to be served by issuing another remand in response to NTN's claim.

   3.  The Court Sustains the Department's Third Match Challenged by JTEKT and Grants
   JTEKT's Motion to Terminate the Preliminary Injunction Affecting JTEKT's Entries

   In *JTEKT I*, the court considered claims by JTEKT alleging that the revised model-match methodology resulted in fourteen specific, impermissible matches.  *JTEKT I*, 35 CIT at __, 768 F. Supp. 2d at 1350-51.  The court dismissed JTEKT's claims concerning thirteen of these fourteen matches but required Commerce to reconsider the remaining claim (which involved what was identified as the "third match") after examining factual information that JTEKT had included in a case brief during the administrative proceeding but that Commerce had chosen not to consider after rejecting the information as untimely.  *Id.* at __, 768 F. Supp. 2d at 1351-53, 1364.  The court directed a remand after concluding that Commerce had failed to justify the decision not to consider the information contained in JTEKT's administrative case brief that called the third match into question.  *Id.*

   In the Second Remand Redetermination, Commerce complied with the court's order to reconsider the third match but continued to find that impermissible mismatches did not occur.[7]

---

[7] Commerce continued to maintain that it was justified in refusing to consider the factual information contained in JTEKT's case brief on the grounds that this information was untimely. *Second Remand Redetermination* 28.  Nevertheless, in response to the court's order, Commerce examined the previously-rejected information that JTEKT had submitted in its case brief and concluded based on that information and information already on the record of the review, (continued…)

*Second Remand Redetermination* 28-29.  Following the Second Remand Redetermination, JTEKT moved for termination of the injunction on liquidation of JTEKT's entries at issue in this case, explaining that "JTEKT no longer seeks to address the dumping margins that were calculated by the U.S. Department of Commerce in the administrative review that is the subject of this litigation."  Mot. to Terminate Prelim. Inj. 1 (Oct. 23, 2014), ECF No. 183 ("JTEKT's Mot. to Terminate Prelim. Inj.").  Moreover, JTEKT has not objected to or otherwise commented on the Department's resolution of the issue posed by the third match.  *See* JTEKT Comments 3 & n.6.  The court, therefore, affirms the Department's resolution of that issue.

The court grants JTEKT's motion for termination of the injunction on the liquidation of JTEKT's entries.  *See* Order of Inj. (Oct. 16, 2007), ECF No. 7 (enjoining liquidation of JTEKT's entries).  According to JTEKT, defendant, through counsel, consents to this motion. JTEKT's Mot. to Terminate Prelim. Inj. 2.  Timken filed a reply consenting to JTEKT's motion. The Timken Co.'s Notice of Consent to JTEKT's Oct. 23, 2014 Mot. to Terminate the Prelim. Inj. 1 (Nov. 5, 2014), ECF No. 187.  The court will terminate the injunction that is the subject of JTEKT's motion.  All other orders of injunction entered in this case remain in effect according to the terms of those orders.[8]

---

(continued…)

including certain proprietary information, that the model sold in the United States and the model sold in the home market were appropriately matched because they actually were of the same design type.  *Id.* at 29 ("Because both the U.S. model and home-market model for the match in question have the same design type, the model-match methodology worked correctly and we have not made an adjustment to our calculation of JTEKT's margin.").

[8] The court entered orders of injunction in each of the cases consolidated under Court No. 07-00377.  *See* Order (Nov. 7, 2007), ECF No. 8 (Ct. No. 07-00387) (NSK's entries); Order (Nov. 1, 2007), ECF No. 9 (Ct. No. 07-00392) (Aisin's entries); Order (Nov. 7, 2007), ECF No. 10 (Ct. No. 07-00395) (NTN's entries); Order (Nov. 7, 2007), ECF No. 9 (Ct. No. 07-00398) (continued…)

C.  The Court Denies as Moot NPB's Challenge Concerning Revocation of the Antidumping
Orders for a Portion of the Administrative Review

In its comments on the Second Remand Redetermination, NPB argued that the margins

challenged in this case were unlawful because of the Department's action to revoke the

antidumping duty order on subject merchandise from Japan for a portion of the POR of the

seventeenth administrative review.  NPB's Comments 2, 6.  NPB's argument relates to litigation

concerning the five-year ("sunset") reviews, conducted pursuant to 19 U.S.C. § 1675(c), of the

antidumping duty orders on ball bearings from Japan and the United Kingdom.[9]  The court

rejects NPB's argument.

In June 2005, the International Trade Commission ("ITC" or the "Commission"),

pursuant to section 751(c) of the Tariff Act, 19 U.S.C. § 1675(c), began the second sunset

reviews of the ball bearing antidumping duty orders.  The ITC determined that revocation of

these orders would be likely to lead to the continuation or recurrence of material injury to an

industry in the United States within a reasonably foreseeable time.  *See Certain Bearings From*

*China, France, Germany, Italy, Japan, Singapore, and the United Kingdom*, 71 Fed. Reg. 51,850

(Int'l Trade Comm'n Aug. 31, 2006).

In this Court, NSK and JTEKT challenged the Commission's sunset review affirmative

injury determinations for ball bearings, NSK with respect to ball bearings from Japan and the

United Kingdom and JTEKT with respect to ball bearings from Japan.  *NSK Corp. v. U.S. Int'l*

_____

(continued…)
(NPB's entries); Order (Nov. 21, 2007), ECF No. 14 (Ct. No. 07-00409) (Asahi's entries); Order
(Nov. 21, 2007), ECF No. 12 (Ct. No. 07-00412) (Nachi's entries).

[9] Pursuant to 19 U.S.C. § 1675(c), every five years after the issuance of an antidumping
duty order, the International Trade Commission conducts a review to determine "whether
revocation of an order, or termination of a suspended investigation, would be likely to lead to
continuation or recurrence of material injury within a reasonably foreseeable time."  *Id.*
§ 1675a(a)(1).

*Trade Comm'n*, 716 F.3d 1352, 1356 (Fed. Cir. 2013) ("*NSK*"), *cert. denied*, 134 S. Ct. 2719

(2014).  After a series of remand orders, this Court affirmed negative injury determinations

issued under protest by the Commission.  *See NSK Corp. v. U.S. Int'l Trade Comm'n*, 34 CIT __,

744 F. Supp. 2d 1359 (2010) (concerning the United Kingdom); *NSK Corp. v. U.S. Int'l Trade

Comm'n*, 35 CIT __, 774 F. Supp. 2d 1296 (2011) (concerning Japan).  Responding to these

judicial decisions, Commerce, on July 15, 2011, revoked the antidumping duty orders on ball

bearings and parts thereof from Japan and the United Kingdom.  *Ball Bearings and Parts

Thereof From Japan and the United Kingdom: Revocation of Antidumping Duty Orders*, 76 Fed.

Reg. 41,761 (Int'l Trade Admin. July 15, 2011).  In its comments on the Second Remand

Redetermination, NPB argued that sales made after July 10, 2005 are no longer subject to the

seventeenth administrative reviews because Commerce revoked the orders involving Japan as of

that date.  NPB's Comments 6.  NPB maintained that because of the revocation, the

weighted-average dumping margins were unlawfully calculated according to sales outside of the

scope of the administrative review.  *Id.*

     After NPB filed comments on the Second Remand Redetermination, the Court of

Appeals reversed the decisions of this Court and vacated the judgment affirming the

Commission's negative determinations regarding the orders on merchandise from the United

Kingdom and Japan.  *NSK*, 716 F.3d at 1369.  As ordered by the Court of Appeals, *id.*, this Court

issued a final judgment reinstating the ITC's affirmative injury determinations on

November 18, 2013.  *NSK Corp. v. U.S. Int'l Trade Comm'n*, 37 CIT __, __, Slip Op. 13-143

at 1 (Nov. 18, 2013).  Subsequently, Commerce reinstated the orders and resumed the

administrative reviews of those orders, including the seventeenth administrative reviews.  *See

Ball Bearings and Parts Thereof From Japan and the United Kingdom: Notice of Reinstatement*

*of Antidumping Duty Orders, Resumption of Admin. Reviews, and Advance Notification of Sunset Reviews,* 78 Fed. Reg. 76,104 (Int'l Trade Admin. Dec. 16, 2013).  In light of the reinstatement of the relevant antidumping duty orders, NPB's argument cannot be sustained.

### III. CONCLUSION

For the reasons discussed in the foregoing, the court concludes that the Second Remand Redetermination conforms to the court's remand order in *JTEKT I* and is in accordance with law. In accordance with this Opinion, the court will enter a judgment affirming the Second Remand Redetermination.  In accordance with the court's opinion and order in *JTEKT I*, 35 CIT at __, 768 F. Supp. 2d at 1363-64, the court's judgment will also affirm the Department's reconsideration of Aisin's constructed export price and recalculation of Aisin's antidumping duty margin in the First Remand Redetermination.

/s/Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated: December 24, 2014
New York, NY